BRIAN E. CLAYPOOL, (SBN 134674)
THE CLAYPOOL LAW FIRM
4 East Holly Street, Suite 201
Pasadena, California 91103
Telephone: (626) 345-5480
Facsimile: (626) 787-1042

FILED

AUG 23 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
      DEPUTY CLERK

SEALED

Attorney for *Qui Tam* Plaintiffs

UNITED STATE DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA AND STATE OF CALIFORNIA *EX. REL.* THOMAS REILLY, GARRETT LEE, KEVIN SCHMIDT, AND TERRY HILLIARD,<br><br>Plaintiffs,<br><br>vs.<br><br>ADVENTIST HEALTH; SAN JOAQUIN COMMUNITY HOSPITAL; AND PREMIER PHYSICIAN ALLIANCE, INC.; RAYMOND ZURCHER, an individual; DONALD CORNFORTH, an individual; KURT HOEKENDORF, an individual; PAUL GRIFFIN, an individual; WILLIAM BRENT SOPER, an individual; SCOTT REINER, an individual; ROBERT BEEHLER, an individual,<br><br>Defendants. | Case No. 1-17-cv-00613-AWI-SKO<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT (31 U.S.C. §3729 et. seq.) AND CALIFORNIA FALSE CLAIMS ACT (CAL GOV'T CODE §§12650 et seq.)**<br><br>**JURY TRIAL DEMANDED**<br><br>**FILED IN CAMERA AND UNDER SEAL (AS REQUIRED BY 31 U.S.C. §3730(a)(2) AND CAL. GOV'T CODE §12652(c)(2)** |

1    Plaintiffs/Relators, Thomas Reilly, Garrett Lee, Kevin Schmidt, and Terry

2  Hilliard through their attorney The Claypool Law Firm on behalf of the United

3
   States of America for this Complaint against Defendants, Adventist Health, San
4
5  Joaquin Community Hospital, Premier Physician Alliance, Inc., Raymond Zurcher,

6  Donald Cornforth, Kurt Hoekendorf, Paul Griffin, William Brent Soper, Scott

7
   Reiner, and Robert Beehler, allege based upon personal knowledge, relevant
8
9  documents, and information and belief, as follows:

10   I.    NATURE OF THE ACTION

11       1.  This is an action to recover damages and civil penalties on behalf of the
12
13  United States of America and the State of California arising from false and/or

14  fraudulent statements, records, and claims made and caused to be made by

15
   Defendants and/or their agents, and employees in violation of the Federal *False*
16
17  Claims Act, 31 U.S.C. §§3729 *et seq.* ("FCA") and the California False Claims Act,

18  Cal. Gov't Code §§12650 *et. seq.* ("the California FCA"). The Complaint alleges

19
   that Defendant knowingly submitted, or caused to be submitted, claims for payment
20
21  to the United States and the State of California that were false or fraudulent in that

22  they were claims for services provided in violation of federal and state laws

23
   prohibiting physician kickbacks and referrals. The Complaint also alleges that
24
25  Defendants knowingly submitted, or caused to be submitted, false records or

26  statements in order to get false or fraudulent claims paid by the Government as well

27
   as claims that were the result of kickbacks.
28

2.  The FCA was originally enacted during the Civil War to redress fraud against the Government. Congress substantially amended the Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating Government fraud, was in need of modernization. Congress intended the amendments to create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf. The California False Claims Act was adopted in 1987 to serve similar purposes for the State of California and its political subdivisions. The California FCA is largely modeled after the FCA.

3.  The FCA and the California FCA both provide that any person who knowingly presents or causes to be presented false or fraudulent claims for payment or approval to the Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims, is liable for a civil penalty for each such claim, plus three times the amount of the damages sustained by the Government.[1]

4.  Both the FCA and the California FCA allow any person with

---

[1] The term "Government" refers to both the California and federal Governments, unless otherwise specifically noted.

information about a violation of the statute to bring an action on behalf of the federal or state Government respectively, and to share in any recovery. Both the FCA and the California FCA require that the complaint be filed under a seal for a minimum of 60 days (without service on the Defendants during that time) to enable the Government to: (a) conduct its own investigation without the Defendants' knowledge; and (b) determine whether to join the action.

5. Based on the FCA and the California FCA, *qui tam* Plaintiffs and Relators Thomas Reilly, Garrett Lee, Kevin Schmidt, and Terry Hilliard seek to recover all available damages, civil penalties, and other relief for the violation alleged herein.

## II.   INTRODUCTION

6. The federal Government seeks to ensure that decisions about federally-funded medical care are made on the basis of sound medical judgment and not on the basis of personal financial gain. To that end, the federal Stark Statute, 42 U.S.C. §1395 nn, and the federal Anti-Kickback Statute, 42 U.S.C. §1320a-7(b)(b), prohibit certain transactions that Congress has concluded render it more likely than not that improper reasons influenced healthcare decision-making. These laws and policies are critical to ensuring the integrity of the federal healthcare system, and therefore compliance with these laws and policies is a condition of payment of federal healthcare dollars.

7. The State of California has a similar interest in ensuring the integrity of

1  decision-making involving state-funded medical care and therefore also prohibits

2  payments to influence patient referrals. California Business and Professions Code,

3  section 650, *et. seq.*, prohibits offering or delivering any consideration as

4
5  compensation or inducement for referring patients to any person.

6      8.  Over the span of the last eight years, The Defendants have knowingly

7
8  made or caused to be made claims for payment for services based on referrals

9  between Defendants that were part of an alleged agreement between Defendants to

10  induce referrals for rendering services for less than fair market value. In 2011,

11
12  Defendants fraudulently backdated a bogus contract to deceitfully attempt to portray

13  medical services rendered and that they had employed fair market value in their

14  dealings. Defendants have also knowingly made or caused to be made claims for

15
16  payment for services based on referrals by physicians with a prohibited financial

17  interest in the Defendants, in violation of the federal and state prohibitions. As a

18  result of Defendants' actions, the United States and the State of California have been

19
20  defrauded of hundreds of millions of dollars they paid for healthcare that they would

21  not have paid if thy had been aware of Defendants' unlawful self-referral and

22  kickback practices, all in violation of the federal FCA and the California FCA.

23  **III.  PARTIES**

24
25      **A. The Relators**

26      9.  Plaintiff/Relator Dr. Thomas Reilly is an individual residing in

27
28

FIRST AMENDED COMPLAINT FOR DAMAGES

Los Angeles County, California. Dr. Thomas Reilly was and is a member and partner of EMSG. From September 1, 2000 to January 3, 2011 EMSG had a contract with San Joaquin Community Hospital to provide emergency medical services for the hospital. Dr. Reilly has personal knowledge of Defendants' practices as alleged in this complaint.

10. Plaintiff/Relator Garrett Lee is an individual residing in Boulder County, Colorado. Dr. Garrett Lee was and is a member and partner of EMSG. From September 1, 2000 to January 3, 2011 EMSG had a contract with San Joaquin Community Hospital to provide emergency medical services for the hospital. Dr. Lee has personal knowledge of Defendants' practices as alleged in this complaint.

11. Plaintiff/Relator Kevin Schmidt is an individual residing in Kern County, California. Dr. Kevin Schmidt was and is a member and partner of EMSG. From September 1, 2000 to January 3, 2011 EMSG had a contract with San Joaquin Community Hospital to provide emergency medical services for the hospital. Dr. Schmidt has personal knowledge of Defendants' practices as alleged in this complaint.

12. Plaintiff/Relator Terry Hilliard is an individual residing in Kern County, California. From June 1995 to the present, Terry Hilliard was and is a management administrator for EMSG. From September 1, 2000 to January 3, 2011 EMSG had a contract with San Joaquin Community Hospital to direct and manage

-7-

the hospital's emergency room. Mr. Hilliard has personal knowledge of Defendants' practices as alleged in this complaint.

### B. The Defendants

13. Defendant Adventist Health is a nonprofit 501(c)(3) organization incorporated in California and may be found in Roseville, California. Adventist Health owns and operates 20 hospitals located in Oregon, California, Washington, and Hawaii. Adventist Health owns and controls Defendant San Joaquin Community Hospital.

14. Defendant San Joaquin Community Hospital ("SJCH") is a nonprofit 501(c)(3) organization with its principal place of business at 2615 Chester Avenue, Bakersfield, California. Defendant SJCH, a hospital with approximately 254 beds, was and is controlled by Defendant Adventist Health. SJCH created Premier Management Services Organization ("PMSO") purportedly as a vehicle for Adventist Health to market parties for the provision of management services including to assist Adventist Hospitals like SJCH on various ventures where a management services organization was needed. However, SJCH was the sole member of PMSO.

15. Defendant Premier Physician Alliance, Inc. ("PPA") is a physician owned independent practice association with its principal place of business in Bakersfield, California. PPA was created by SJCH as a provider network for the hospital's prison inmate patients. PPA was responsible for billing the California

Department of Corrections and Rehabilitation ("CDCR") and federal government for services rendered by EMSG and other physicians at SJCH for its state and federal inmate patients.

16. Defendant Raymond Zurcher is an individual residing in Lincoln County, Montana and Al Hasa, Saudi Arabia.

17. Defendant Donald Cornforth is an individual residing in Kern County, California.

18. Defendant Kurt Hoekendorf is an individual residing in Ventura County, California.

19. Defendant Paul Griffin is an individual residing in Fresno County, California.

20. Defendant William Brent Soper is an individual residing in Placer County, California.

21. Defendant Scott Reiner is an individual residing in Placer County, California.

22. Defendant Robert Beehler is an individual residing in Placer County, California.

## IV.   JURISDICTION AND VENUE

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to

31 U.S.C. §§3729 and 3730, as well as related claims under state law. Since there has not been a public disclosure of the allegations or transactions of fraud, the Relators qualify as the original source of the information. They have direct and independent knowledge of the information on which the allegations are based and voluntarily provided the information to the Government before filing this action.

24. Personal jurisdiction and venue are proper in this judicial district pursuant to 28 U.S.C. §1391(b) and §1395(a) and 31 U.S.C. §3732(a), as the Defendants are found in, have or have had a agent or agents, have or have had contacts, and transact or have transacted business in this district.

## V.   APPLICABLE LAW AND PROGRAMS

### A. The Federal Anti-Kickback Statute Prohibits Offering or Providing Financial Rewards to Induce the Purchase of Goods or Services Paid for by Federal Funds

25. The federal Anti-Kickback Statute prohibits any person or entity from offering, providing, or accepting payments to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. §1320a-7b(b). Specifically, the law makes it a felony to "knowingly and willingly "offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly, or covertly, in cash or in kind to any person to induce such person-(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in

1   part under a Federal health care program, or (B) to purchase, lease, order, or arrange

2   for or recommend purchasing, leasing, or ordering any good, facility, service, or

3
4   item for which payment may be made in whole or in part under a Federal health care

5   program." 42 U.S.C.§1320a-7b(b)(2). The statute also prohibits the other side of a

6   kickback transaction – soliciting or receiving any remuneration in return for such

7
8   referrals or purchases. 42 U.S.C. §1320a-7b(b)(1).

9       26. The Anti-Kickback Statute arose out of Congressional concern that

10  payoffs to those who can influence healthcare decisions not only increases the cost

11
12  of healthcare, but also will result in goods and services being provided that are

13  medically unnecessary, of poor quality, or even harmful to a vulnerable patient

14  population. To protect the integrity of federal health care programs from these

15
16  difficult to detect harms, Congress enacted a prohibition against the payment of

17  kickbacks in any form, regardless of whether the particular kickback actually gives

18  rise to overutilization or poor quality of care.

19
20      27. Violation of the Anti-Kickback Statute subjects anyone who violates it

21  to criminal monetary penalties and imprisonment of up to five years per violation.

22  42 U.S.C. §1320a-7b(b). In addition, any party convicted under the Anti-Kickback

23
24  Statute must be excluded (*i.e.*, not allowed to bill for services rendered) from federal

25  health care programs for a term of at least five years. 42 U.S.C. §1320a-7(a). Even

26  with a conviction, if the Secretary of HHS finds that a provider has violated the

27
28  statute, the Secretary may exclude that provider from the federal health care

-11-

programs for a discretionary period (in which even the Secretary must direct the relevant State agency(ies) to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. §§1320a-7a(a); 1320a-7(b).

28. The federal government has promulgated regulations that specify those payment practices that will not give rise to liability under the Anti-Kickback Statute. These "Safe Harbor" regulations, 42 C.F.R. §1001.952, list various circumstances under which a payment to a healthcare provider would not give rise to liability under the Anti-Kickback Statute.

29. Once the Government has demonstrated each element of a violation of the Anti-Kickback Statute, the burden shifts to the defendant to establish that the defendant's conduct was protected by a safe harbor or exception. The Government need not prove that the defendant's conduct does not fit within a safe harbor or exception.

**B. California Prohibits Payments for Patient Referrals and Kickbacks**

30. Like the federal Government, the State of California prohibits payments that may inappropriately influence health care decision-making. California Business and Professions Code, sections 650 *et seq.*, prohibit healthcare providers from making payments for referrals of patients.

//

//

## VI.   BACKGROUND

### A. Defendant Adventist Health's Past History of Being Investigated for Kickback Schemes by the Government

31. Adventist Health and SJCH are no strangers to committing fraud against the government. Nor are they strangers to being investigated by the U.S. Attorney General's Office. From March 25, 2006 to May 4, 2009 SJCH entered into financial relationships involving engagements with physicians that did not comply with the requirements of the Physician Self-Referral Law (the "Stark Law") and submitted false claims to the Medicare Program. Most disturbing is that these violations to the Stark Law were occurring contemporaneous to the violations discussed herein, underscoring the deceit and manipulation. Moreover, SJCH was being investigated by the U.S. Attorney General's Office for its previous violation of the Stark Law while committing the violations of the Anti-Kickback Statute discussed in this instant action. A settlement was reached between SJCH and the U.S. Attorney General's Office in March 2011, during a time in which SJCH was carrying out a separate mission to defraud the state and federal government.

32. The Attorney General's Office has also investigated Adventist Health countless times. One of the larger and more local investigations involved Adventist Health and its affiliated hospital White Memorial Medical Center in Los Angeles. The investigation involved allegations that Adventist improperly compensated physicians who referred patients to White Memorial by transferring assets at less

than market value and compensating them at above fair market value for teaching services in violation of the Anti-Kickback Statute and Stark Statute. The Adventist and White Memorial investigation resulted in a $14.1 million settlement in May 2013.

33. At all times relevant to this complaint, the Defendants maintained prohibited financial relationships between themselves, and paid kickbacks to each other, for the referral of patients to them and submitted claims for the services provided pursuant to the prohibited referrals and payments. Those financial relationships took the form of the creation and ownership of a "sham" management services organization that had a purported agreement with PPA for well under fair market value, resulting in Defendant PPA referring tens of thousands of inmate patients over at least an eight year time period from its contract with the California Department of Corrections and Rehabilitation ("CDCR") to Defendant SJCH. This took place from at least April 2008 to 2013, but has likely been going on into the present.

## B. The Interrelationship of Defendant PPA, the Hospital Defendants and Defendant Adventist Health

34. Defendant Adventist Health owns the assets of and controls Defendant SJCH. As alleged below, the Hospital Defendant is not independent of Defendant Adventist Health, which share many of the same employees.

### 1. Overlapping Employees Among Defendants

35. At all times relevant to the complaint, members of Defendants

Adventist Health, SJCH, and PPA overlapped and held dual roles among the

Defendant entities. Below is a list of overlapping roles.

- Raymond Zurcher:    SJCH Emergency Room Medical Director
                      President of PPA
                      Founding Member of PMSO

- Donald Cornforth:   Chief of Staff at SJCH
                      Vice President and CEO of PPA

- Kurt Hoekendorf:    Regional Vice President of Adventist
                      Vice President at SJCH
                      Business Manager/Consultant to PPA
                      Board Member/Adviser to PMSO

- William Brent Soper: CFO at SJCH
                       CFO for PMSO

- Lee Taylor:         Claim Processor for PPA from April '08-Jan. '09
                      VP of Contract Development for Adventist Health

- Northwest Adventist: Owned by Adventist Health
                       Claim processor for PPA from Jan. '09-'10

- Diane Johnson:      Employee of Adventist Health
                      Claim processor for PPA beginning in '10

- Marla Burris:       Employee of Adventist Health
                      Claim processor for PPA beginning in '10

- Scott Reiner:       CEO at Adventist Health
                      Board Member at PMSO

- Robert Beehler      CEO at SJCH
                      CEO for PMSO

## C. Defendant Adventist Health Owned and Controlled Defendant SJCH Who in Turn Created and Controlled PPA and PMSO

36. On September 1, 2000, EMSG entered into a contract with SJCH to provide emergency medical services to the hospital.

37. Adventist Health owns and operates SJCH.

38. On July 25, 2006, PPA was created, at the urging of Hoekendorf and SJCH, as a provider network for the hospital's prison inmate patients. Hoekendorf testified at his deposition, in an unrelated case, that creating PPA was his idea. PPA existed primarily to contract with providers to service prison inmates at SJCH. On April 1, 2008, PPA contracted with CDCR and began receiving prison inmate patients. According to Hoekendorf, the, "PPA/CDCR contract was also for the benefit of the hospital [SJCH]." All physicians/groups, including EMSG, servicing inmates at SJCH were required to be members of PPA by contracting with it to provide services to inmates. Any physician or group that refused to join PPA was threatened with loss of staff privileges and termination of their contract with SJCH. PPA was needed in order for SJCH to maintain its contract to service inmates; SJCH's most lucrative contract. A report generated by PPA shows that between February 2009 and June 2010, PPA processed a total of 39,967 prison inmate claims, for an average per month of 2,351 claims. These mainly represent prisoner patients to the state of California with federal prisoner patients making up about 10% percent of the claims. It would thus be fairly accurate to estimate that PPA has

-16-

averaged 1,500 claims per month since its inception with a total of about 156,000 claims.

39. PPA was responsible for billing the CDCR for all services provided by EMSG physicians in the emergency room as well as any other physicians at SJCH that treated inmate patients. After receiving payment from CDCR, PPA was to send payment to the treating physicians. However, treating physicians like the members of EMSG were not being paid and that money was instead being diverted to SJCH. This also occurred with billing of federal inmates. Federal inmates from Taft Correctional Institute began being taken to SJCH in 2007. All billing for federal inmates was funneled through PPA. From 2007 to at least 2009, billing of payments for medical services were sent by PPA to First Medical Management ("FMM"), a third party billing and processing administrator for the federal government. FMM would then send the claim to the federal government for payment. Once FMM received the payment form the federal government it sent payment to PPA. This diversion of money was further accomplished by the creation of PMSO.

40. On December 21, 2006, SJCH created and formed PMSO purportedly as a vehicle for Adventist Health to market parties for the provision of management services including to assist Adventist Hospitals, like SJCH, on various ventures where a management services organization was needed, such as providing administrative services. In fact, Beehler, who was SJCH's CEO at the time and who appointed himself PMSO's CEO, testified at a recent deposition that SJCH owned

-17-

PMSO. SJCH was the sole member of PMSO. From its inception, PMSO existed without an executed Operating Agreement. It was Beehler's idea that PPA contract with PMSO to begin with, as testified to by Cornforth under oath. Furthermore, Cornforth testified, under penalty of perjury, that his duties as vice president and CEO of PPA included, "dealing with the MSO, which was an Adventist MSO."

41. It was not until late 2011 that a feigned operating agreement between PMSO and PPA was executed. This sham 2011 agreement was backdated to 2008 in order to coincide with PPA's contract with CDCR. Zurcher himself (SJCH ER Director, President of PPA & founding member of PMSO), approved the creation and implementation of the backdated sham agreement and even signed it himself. Zurcher did so in order for the shell corporation to look legitimate and facilitate the diversion of state and federal dollars. However, the truth is, PMSO never operated as a bona fide entity, as confirmed by Soper and Cornforth in depositions given under oath. The PMSO never had its own employees, instead using Adventist Health and SJCH employees and outsourcing services to third parties, when services were actually provided.

42. Mid-2011 correspondence between Hoekendorf, Zurcher, Beehler, Cornforth confirmed that the, "MSA was to take effect on November 11, 2008 which is when the CDCR contract went into effect…" In fact, PPA began treating inmates in April 2008, not November, but Hoekendorf mistakenly believed the date of the PPA/CDCR contract was November 2008 and backdated the PMSO contract

-18-

to coincide with that. Email correspondence between Hoekendorf, Zurcher,

Cornforth and Adventist Counsel Jennifer Yoo revealed that on October 19, 2011, a

draft of the MSA agreement between PMSO and PPA was still being circulated and

finalized. In his deposition, Hoekendorf, vice president of SJCH, consultant to PPA,

and board member for PMSO, admitted that the initial agreement between PPA and

PMSO was verbal. In fact, there was no written contract in place at all for the first

three years that PPA began working with prisoner patients. The feigned and

backdated written contract was not consummated until late 2011 and this was only

done as a means to cover up illegal and fraudulent conduct that would be discovered

in the *Emergency Medical Services Group v. Raymond Zurcher* suit that was filed in

2011 and involved allegations against PPA, PMSO, and SJCH. This explains why

the contract was backdated. The fact that no written agreement was in place until the

end of 2011 is categorical evidence that there was never a fair market value

established for PMSO's management services as required by law. Furthermore,

there is no documentation that indicates the existence of a verbal contract or its

terms – no memorandum, email, letter, etc. From 2008 through 2010, the years

Hoekendorf claims a verbal contract existed between PPA and PMSO and

coincidently, the dates to which the PPA/PMSO written contract was backdated to,

PPA's own financial ledgers evidence large sum payments going directly from PPA

to SJCH. Even Cornforth admitted that these payments should have been going from

PPA to PMSO, not from PPA to SJCH. There was no reason for SJCH to be

involved in receiving payments from PPA if a management company such as PMSO had actually been established. This nefarious conduct by PPA and SJCH was illegal in many respects. The payments are further proof that no fair market value was ever established between PPA and PMSO as required by law. Moreover, some of these large sum payments to SJCH were for advanced fees. It was not possible for PPA to know with such certainty how much future revenue it would be receiving from the state of California so as to pay the hospital for this advanced fees without any indication of payment being at fair market value.

43. It is of note that Hoekendorf was intimately involved in SJCH, PPA, and PMSO. In addition to wearing multiple hats within the Adventist organization, Hoekendorf also owned a medical consulting company that provided services to PPA. Cornforth testified at deposition that PPA paid SJCH directly for Hoekendorf's services when it should have been paying PMSO. Furthermore, Cornforth, the vice president and CEO of PPA, "was not sure" if a contract ever existed between Hoekendorf and PPA. Therefore, PPA was paying a hospital employee to perform vital functions for PPA without a contract.

44. PMSO was merely a sham company created to be a conduit for funds to be diverted from PPA to SJCH. PMSO was not independent of either Defendants Adventist Health, SJCH, or PPA. All Defendants controlled PMSO through overlapping members as listed above. PPA's financial ledgers beginning in 2008 and continuing through 2010 show large sum payments going directly from PPA to

SJCH. In addition, the 2012 through 2015 tax returns for SJCH list PMSO as a disregarded entity directly controlled by SJCH. Between 2012 and 2015 PMSO's reported income and assets changed drastically. In 2012 PMSO had a reported income of $335,121 and assets totaling $2,475,308. Somehow the following year, 2013, PMSO's income was in the negative $84,468.00 and its assets had dwindled down to $280,358.00. Then, the 2014 tax returns for SJCH list PMSO as having a negative income in the amount of $4,613.00. Furthermore Wayne Long, the CPA for both PPA and Conrnforth (VP and CEO for PPA and Chief of Staff at SJCH), testified at deposition that PPA maintained a bank account and funds "off the books." PMSO was the management company for PPA. Had PPA been paying fair market value for PMSO's management services there is no reason for PMSO to have a negative income. The reported assets in and of themselves are suspect – where did they come from and what happened to the nearly $2.5 million? PMSO's own CFO, Soper stated under oath in his deposition that PMSO had no bank account, no funds, no revenue flowing in, conducted no invoicing, no client contracts and never held a board meeting. All of this is evidence of PMSO clearly being a sham company used by SJCH and PPA to hide their illegal conduct of having PPA directly pay SJCH and its employees.

45. Further proof of PMSO being a sham business entity include:

- PMSO CEO Beehler and CFO Soper both indicated in their depositions that they did not pay attention to the operations of PMSO and there was

rarely a board meeting. In fact, no board meetings were held between 2008 and 2011;

- CFO Soper testified at deposition that he does not recall any funds ever being deposited into PMSO;

- PMSO had no bank accounts;

- PMSO did not produce any financials;

- There was no executed agreement between PMSO and PPA until late 2011;

- PMSO did not have a formal program for Quality Assurance/Utilization Management;

- PPA had not been paying administrative fees on a monthly basis;

- PMSO had never submitted a statement to PPA for the services rendered;

- The fees were still being negotiated in 2011 so that PPA could continue to exist;

- PPA never issued a check or payment to PMSO;

- PPA did not have the reserves to pay additional fees to PMSO;

- PPA only operated at a certain margin (with such margin being the CDCR payments actually received less amounts due PPA providers for services rendered);

- PMSO's members realized it would have a hard time providing its services for less than 5% and yet eventually agreed to a 5% fee with PPA;

- A "Draft prototype Invoice" for PMSO to submit to PPA was still being circulated by Hoekendorf for review in July 2011;

- PPA ledgers show sporadic payments directly to SJCH in varying lump sums including substantial six figure sums at the close of the calendar year. All payments made by PPA were paid directly to SJCH, not PMSO.

## Count I

### False Claims Act, 31 U.S.C. §§3729(a)(1) and (a)(2)

46. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 45 as though fully set forth herein.

47. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, *et seq.*, as amended.

48. By virtue of the act described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval within the meaning of 31 U.S.C. §3729(a)(1).

49. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, within the meaning of 31 U.S.C. §3739(a)(2).

-23-

50. The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid claims that would not have been paid but for Defendants' unlawful conduct.

51. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in an unknown amount but minimally in the hundreds of millions of dollars.

52. Additionally, the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. §3729 arising from Defendants' unlawful conduct as described herein.

## Count II

## California False Claims Act, Cal. Gov't Code §§ 12651(a)(1) and (a)(2).

53. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 52 above as though fully set forth herein.

54. This is a claim for treble damages and civil penalties for violations of Gov't Code §§12651(a)(1) and (a)(2).

55. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval within the meaning of Cal. Gov't §12651(a)(1).

56. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and

-24-

omitted material facts, to get false and fraudulent claims paid or approved, within the meaning of Cal. Gov't Code §12651(a)(2).

57. The State of California, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid claims that would not have been but for Defendants' unlawful conduct.

58. By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in an unknown amount but minimally in the hundreds of millions of dollars.

59. Additionally, the State of California is entitled to a penalty of at least $5,000 and up to $10,000 for each and every violation of Cal. Gov't Code §12651 arising from Defendants' unlawful conduct as described herein.

### Count III

### Federal Anti-Kickback Statute 42 U.S.C. §1320a.

60. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 59 above as though fully set forth herein.

61. The Anti-Kickback Statute 42 USC § 1320a-b (b), applies to any federal healthcare program. "Federal healthcare program" is (1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States; and (2) any State health care program [which may be jointly funded by the federal

government through Medicaid statutes, for example]. The definition includes medical services for federal prisoners.

62. The Federal Anti-Kickback Statute (42 USC § 1320a-7b(b)) makes it a criminal offense to knowingly offer, solicit or receive any remuneration, directly or indirectly, overtly or covertly, to induce referrals of items or services reimbursable by a federal health care program (including Medicare and Medicaid/Medi-Cal).

63. Where remuneration is paid purposefully to induce or reward referrals of items or services payable by a federal health care program, the Federal Anti-Kickback Statute is violated. Non-compliant arrangements are a "double-edged sword." By its terms, the statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction, and is equally applicable to businesspersons and business entities as it is to any physicians or other licensed professionals directly or indirectly (through ownership or otherwise) engaged in the arrangement.

64. Defendants developed and implemented a scheme for SJCH to provide kickbacks to PPA in violation of state and federal health care laws prohibiting self-referrals and kickbacks. The purpose of these kickbacks was to induce referrals of federal and state inmate business to SJCH. The kickbacks constitute a systematic disregard for federal and state laws designed to ensure that

-26-

1   Government-funded healthcare is based on sound medical judgment rather than

2   personal financial gain.

3          65. SJCH created and formed PMSO purportedly as a vehicle for

4   Adventist Health to market parties for the provision of management services

5

6   including to assist Adventist Hospitals, like SJCH, on various ventures where a

7   management services organization was needed, such as providing administrative

8
    services. However, SJCH was the sole member of PMSO.
9

10         66.  PMSO allegedly provided management services for PPA.

11  However there was no agreement in place between the two entities until late 2011.
12
    At that time, Defendants backdated the Management Services Agreement to
13

14  November 2008 to coincide with PPA's contract with CDCR for inmate patients.

15  Prior to the executed agreement in 2011 there was no management fee agreed to by

16
    the entities.
17

18         67. Defendants Adventist Health and SJCH through PMSO gave

19  kickbacks to PPA to induce the referrals of federal and state inmate patients. These
20
    kickbacks can be shown to exist through PPA paying less than fair market value to
21

22  PMSO/SJCH for services rendered and Defendants' own intent. Federal inmates

23  from Taft Correctional Institute began being taken to SJCH in 2007. All billing for
24

25  federal inmates was funneled through PPA. From 2007 to at least 2009, billing of

26  payments for medical services were sent by PPA to First Medical Management

27
    ("FMM"), a third party billing and processing administrator for the federal
28

government. FMM would then send the claim to the federal government for

payment. Once FMM received the payment form the federal government it sent

payment to PPA.

68. The Centers for Medicare and Medicaid Services (CMS) takes the

well-established position that it expects parties to make a determination of fair

market value at the time the financial relationship is created.  Courts have also relied

on the analysis prepared by entities at the time the arrangement was entered into

rather than an analysis prepared subsequently to justify the existing arrangement.

*See U.S., ex rel., Goodstein and Grossman v. McLaren Regional Medical Center,*

*Family Orthopedic Realty, L.L.C., et. al* (United States District Court, E.D.

Michigan, Southern Division, February 14, 2002).

69. CMS stresses that written documents may only be relied on for

referrals made after the documents were created, but not for referrals that predate the

document. This is in part because CMS believes that a grace period for the writing

requirement poses a risk of program or patient abuse because an entity could adjust

the rate of compensation during the proposed grace period in a manner that takes

into account the volume or value of the physician's referrals. Furthermore, parties

cannot meet the set in advance requirement from the inception of an arrangement if

the only documents stating the compensation term of an arrangement were

generated after the arrangement began. However, if the parties create

contemporaneous documents during the course of the arrangement, and the

-28-

documents set the compensation out in writing, then the parties may be able to satisfy the set in advance requirements for referrals made after the contemporaneous documents were created. According to the CMS, the most straightforward way to comply with the writing requirement of the physician self-referral law is to reduce the key facts of an arrangement to a single signed writing before either party provides items, services, space, or compensation to the other party under the arrangement. Essentially, for the arrangement in writing requirement, the writing needs to be in place at the time the arrangement begins.

70. The timing of the rate determination is dispositive here. The parties had no executed agreement in place at the time the arrangement began and were also negotiating and disputing the rate until the very last minute. There is no evidence of a contemporaneous agreement. When in late 2011, an executed agreement was finally created, the agreement was purposefully backdated to coincide with PPA's 2008 contract with CDCR.

71. In addition to the writing requirement, the agreement between the parties must be for fair market value of any services provided to avoid the Federal Anti-Kickback Statute from being violated.

72. The rate of determination is critical in this analysis. SJCH and PPA never determined fair market value, primarily because SJCH was only concerned with assuring the continued viability of PPA in order to maintain its

lucrative inmate contracts. For example, SJCH established its retroactive rate of 5%

as a "backed-into number" expressly:

> (1) Meant to ensure the viability of PPA at a margin it could continue
> to exist on so that SJCH's own income would not be lost;
> (2) Based on reference to actual collection amounts as primary
> consideration; and
> (3) Based on a look-back of costs previously incurred, rather than with
> reference to the actual fair market value of services rendered.

73. The reduction to the 5% fee was also in consideration of the

forgiveness of amounts otherwise previously owed.

74. There was no bona fide profit margin being sought to be earned

by SJCH for its provision of services to PPA, making the agreement commercially

unreasonable. PPA was also never invoiced until SJCH decided that an invoice

would create better optics. PPA was never at risk of PMSO terminating its

management services relationship for non-payment as a normal debtor would be

concerned with. Additionally, the retroactively dated agreements included services

that were never actually provided, for example – Quality Assurance/Utilization

Management. This further supports the farcical nature of PMSO and lack of any fair

market value consideration for services that were supposed to be provided. The

parties cannot retroactively justify rates that were never actually evaluated, invoiced,

paid on a regular basis, or enforced.

75. The Anti-Kickback Statute has been broadly and consistently

construed by the Federal Office of Inspector General and courts to implicate any arrangement where even only one purpose of the remuneration was to obtain money for the referral of items and services to induce further referrals. PPA's contract with CDCR was a lucrative landmark deal for Defendants. The existence of PPA needed to be ensured at all costs. Adventist Health and SJCH were pre-disposed to provide all necessary support and services to PPA without reference to the circumstances or implications of providing those services. This is further shown in Defendants having PMSO operate without an agreement and at a rate below fair market value of 5%.

76. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made remuneration to induce referrals of items or services, to get false and fraudulent claims paid or approved, within the meaning of 42 U.S.C. §1320a.

77. The United States, unaware of remunerations made to induce referrals and consequent fraudulent claims made or caused to be made by the Defendants, paid claims that would not have been paid but for Defendants' unlawful conduct.

78. By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in an unknown amount but minimally in the hundreds of millions of dollars. Violation of the Anti-Kickback Statute subjects anyone who violates it to criminal monetary penalties and imprisonment of up to five years per violation. 42 U.S.C. §1320a-7b(b). In addition, any party convicted

under the Anti-Kickback Statute must be excluded (*i.e.*, not allowed to bill for services rendered) from federal health care programs for a term of at least five years. 42 U.S.C. §1320a-7(a). Even with a conviction, if the Secretary of HHS finds that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which even the Secretary must direct the relevant State agency(ies) to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. §§1320a-7a(a); 1320a-7(b).

## Count IV

### California Anti-Kickback Statute Bus. & Prof. Code §650.

79. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 78 above as though fully set forth herein.

80. Pursuant to California's Anti-Kickback Statute, the offer, delivery, receipt, or acceptance by any licensed person of any rebate, refund, commission, preference, patronage dividend, discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person, irrespective of any membership, proprietary interest, or co-ownership in or with any person to whom these patients, clients, or customers are referred, is unlawful. The word "person" includes an individual, firm,

partnership, association, corporation, limited liability company, or cooperative

association (See CA Business & Professions Code § 653.)

81. It has been noted that: "Unlike the Federal Anti-kickback Statute, there is no language in Section 650 requiring that a violation be committed "knowingly" or "willfully." The violation of …section 650 is a general intent crime, requiring proof only that the defendant offered consideration as inducement for referrals; no specific intent is required." (See People v. Guiamelon 205 Cal.App.4[th] 383 (2012).)

82. Under the California Anti-Kickback Statute, it can also be argued for the same reasons stated above, the payments between PPA and PMSO were demonstrably not established so as to be commensurate with the value of the services provided. PMSO made no profit and it was not its purpose to make a profit. This is evidence that there was remuneration from SJCH to PPA in the form of discounted (and possibly free) services that did not constitute fair market value and have no commercially reasonable business purpose or upside to SJCH outside the continued referral of inmate business and the resulting income received by SJCH from the CDCR contract with PPA for inmate services.

83. In addition to the kickback scheme described above, Defendants had an additional kickback scheme involving Dr. Paul Griffin who was the directing physician for several California prisons.

84. Dr. Griffin was approached in December, 2008 by Hoekendorf and Dr. Paul Fuller of Adventist and SJCH to set up a system of paying Dr. Griffin to refer his CDCR patients to SJCH as opposed to its competitor hospital, Mercy Hospital. At his deposition, Hoekendorf admitted under oath that Dr. Griffin was being paid by PPA to triage patients to PPA. Emails between Dr. Griffin and Hoekendorf from January 2009 memorialize the illegal scheme of Dr. Griffin referring prisoners under control of the California Department of Corrections incarcerated at prisons located at Coalinga and Avenal, California to SJCH. A January 9, 2009 email from Hoekendorf to Dr. Griffin state," In the meantime, when we last spoke you indicated that you had the ability and over-site responsibility related to inmate patient transfer from some of the hospital facilities in the Central Valley that are unable to either accommodate the inmates, or handle the medical needs of the inmate patients in the acute care setting. Previously you indicated that you were turfing the more tertiary cases over to CHW Mercy Hospital in Bakersfield and not to AH San Joaquin Community Hospital." Hoekendorf's emails continue to say, " We look forward to working with you on both the physician panel creation for the Central Valley and for receiving inmate patient admissions transfers from Central Valley Facilities." The email from Hoekendorf to Dr. Griffin even states, "I will be calling you to discuss the PPA compensation strategy for your efforts in helping us build a physician panel…" The physician panel was to consist of physicians at SJCH that Dr. Griffin would directly refer his CDCR patients to.

-34-

1  Soon after this correspondence, PPA's ledgers indicate payments being made from

2  PPA to Dr. Griffin. These were made under the guise of Dr. Griffin being a

3  consultant and hospitalist retained by PPA, which was not the case.

4

5         85. Dr. Griffin was a contract California state employee who oversaw,

6  on behalf of California, the transfer of inmates from prisons to hospitals. SJCH

7  wanted that inmate business to be sent to them, not their competitor Mercy Hospital,

8

9  which was where Dr. Griffin was sending inmates. Thus, the arrangement was set up

10  with Griffin to triage the patients to SJCH, as confirmed by Hoekendorf in his

11  deposition. The talk between Hoekendorf and Dr. Griffin about provider panels was

12

13  superfluous and designed to detract from what was really being agreed to – Dr.

14  Griffin's triage of inmate patients to SJCH. The flow of state and federal inmate

15  patients to SJCH were a goldmine, particularly in 2009 and 2010 when the state was

16

17  reimbursing for prisoner care at a higher reimbursement rate than later years. It also

18  served the purpose of compromising the financial stability of SJCH's main

19  competitor Mercy Hospital.

20

21         86. Further evidence of the illegal patient referral system between

22  SJCH, PPA and Dr. Griffin is shown in a February 13, 2009 email between Beehler,

23  Cornforth, Zurcher and Scott Reiner which indicates Griffin's primary role was to

24

25  triage prisoner patients to SJCH.

26         87. PPA's ledgers evidence that PPA paid Griffin between $2500.00 to

27  $3000.00 monthly.

28

88. By virtue of the acts described above, Defendants offered consideration as inducement for referrals in order to get false and fraudulent claims paid or approved, within the meaning of Bus. & Prof. Code §650.

89. The United States, unaware of consideration made to induce referrals and consequent fraudulent claims made or caused to be made by the Defendants, paid claims that would not have been paid but for Defendants' unlawful conduct.

90. A violation is a public offense and is punishable by imprisonment or a fine of up to $50,000 for each violation.

## Count V

## Mail/Wire Fraud 18 U.S.C. 1341 and 1343.

91. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 90 above as though fully set forth herein.

92. In order to find a violation of mail/wire fraud, it must be shown that:

1) defendant devised a scheme to defraud or to obtain money by means of false or fraudulent pretenses; and 2) defendant used the mail in furtherance of the scheme. *Schmuck v. United States* 489 U.S. 705, 721 (1989). The materials mailed do not need to be false or deceptive. Almost any fraudulent conduct can constitute a "scheme or artifice to defraud."

-36-

93. Attempting or conspiring to commit mail fraud or aiding or abetting the commission of those offenses carries the same civil penalties as the underlying offense. 18 U.S.C. 1849. In order to aid or abet another to commit a crime it is necessary that a defendant in some sort associate himself with the venture, that he or she participated in it as in something he or she wishes to bring about, that he or she seek by their action to make it succeed. To prove, the government must establish: 1) two or more persons, directly or indirectly, reached an agreement to devise and execute a scheme to defraud; 2) the defendants knew the unlawful purpose of the agreement; and 3) the defendants joined in the agreement willfully that is, with the intent to further the purpose. *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009).

94. As discussed above, PPA and PMSO/SJCH had a kickback scheme in place in which PPA referred inmates to SJCH who in turn provided services to PPA under fair market value, or sometimes, at no charge at all. PPA was receiving remuneration from PMSO/SJCH for referring inmates to SJCH. Its claims for payment to government agencies were therefore fraudulent due to the kickback scheme. PPA submitted these claims to government agencies knowing that they were the result of fraudulent conduct. While the claims for payment were in and of themselves legitimate in the sense that PPA was billing for services that were actually provided to inmates, because the billed claims were the product of a kickback scheme, they are still considered fraudulent and false statements. PPA's

kickback scheme with PMSO/SJCH was a scheme to defraud the government and to obtain money by means of fraudulent pretenses in that the claims it was billing were the result of a kickback scheme in which it referred patients to SJCH and in turn PMSO/SJCH provided services for less than FMV or at no charge at all. PPA used the mail to submit each claim for payment that resulted from the kickback scheme.

95. Defendants also violated the mail/wire fraud statute through PPA and SJCH's kickback scheme with Dr. Griffin in which Dr. Griffin was being paid to refer patients to SJCH. Every inmate that Dr. Griffin referred to SJCH resulted in at least one claim being submitted to the CDCR for payment. The claims for payment were submitted using the mail service.

96. By virtue of the acts described above, Defendants conspired to commit mail fraud by knowingly devising a scheme to submit claims to the government that stemmed from fraudulent conduct of a kickback scheme to get false and fraudulent claims paid or approved.

97. The United States, unaware of Defendants' scheme to defraud and obtain money by fraudulent pretenses through Defendants' use of the mail, paid claims that would not have been paid but for Defendants' unlawful conduct.

## Count VI

## Federal Antitrust Law.

98. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 97 above as though fully set forth herein.

-38-

99. Congress passed the first antitrust law, the Sherman Act in 1890 as a "comprehensive charter aimed at preserving free and unfettered competition as the rule of trade." In 1914, Congress passed two additional antitrust laws: The Federal Trade Commission Act, which created the FTC, and the Clayton Act. With some revisions, these are the three-core federal antitrust laws still in effect today. The antitrust laws proscribe mergers and business practices in general terms, leaving courts to decide which ones are illegal based on facts of each case. Courts have applied the antitrust laws to changing markets.

100. The Sherman Act outlaws "every contract, combination or conspiracy or combination to monopolize."

101. The penalties for violating the Sherman Act can be severe. Although most enforcement actions are civil, the Sherman Act is also a criminal law, and individuals and businesses that violate it may be prosecuted by the Department of Justice. Criminal prosecutions are typically limited and clear violations such as when competitors fix prices or rig bids. The Sherman Act imposes criminal penalties of up to $100 million for a corporation and $1 million for an individual and up to ten years in prison.

102. The Federal Trade Commission (FTC) bans "unfair methods of competition" and "unfair or deceptive acts practices." The Supreme Court has said all violations of the Sherman Act violate the FTC Act. The FTC Act also reaches other practices that harm competition, but that may not fit neatly into

1    categories of conduct formally prohibited by the Sherman Act. Only the FTC brings

2    cases under the FTC Act.

3          103. The Clayton Act addresses specific practices that the

4    Sherman Act does not clearly prohibit, such as mergers and interlocking directorates

5    (i.e. the same person making business decisions for competing companies). An

6

7    amendment to the Clayton Act in 1936, the Robinson-Patman Act, bans certain

8    dissimilatory prices, services and allowances in dealings between merchants.

9

10         104. In the present case, the course of dealing likely affected

11   competition in the geographical area in which the SJCH operated in various ways.

12

13   Such effect on competition could give rise to claims that SJCH's and/or PPA's

14   arrangements violate Federal and California antitrust and unfair competition laws

15

16   under a variety of theories. Of note is that the memo from Cornforth to Hoekendorf

17   and Zurcher dated 6/21/11 indicating PPA did not have a formal program for

18   Quality Assurance/Utilization Management and the correspondence inquiries as to

19

20   whether this raises compliance issues. That, in fact, raises compliance issues about

21   Anti-trust enforcement. PPA can potentially be found to have not been properly

22   "*clinically integrated*" and/or financially integrated and therefore operated as an

23

24   unchecked mechanism for collective bargaining by independent physician practices

25   in violation of Antitrust law. (Note: PPA was not clinically or financially

26   integrated.)

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES

1    105. PPA and the Hospital relied on kickbacks and fraudulent practices

2    to harm competition. In the geographical area, the Hospital and PPA conducts

3    business (Kern County, California), there are two hospitals that receive inmate

4

5    patients: San Joaquin Adventist, and Mercy Bakersfield (part of the Dignity

6    Healthcare organization). These two hospitals are the facilities structurally equipped

7    to handle high-risk security patients, because of the hospital's "lock down" areas

8

9    within the facilities. The geographical area these two hospitals draw inmate patients

10   from include: Kern, Kings, Tulare and Fresno counties. There are ten prisons,

11   including one federal prison in these counties. The competition is considerable for

12

13   the inmate business as it is considered (in SJCH's business model), the "most

14   lucrative book of business the hospital maintains" (quote from deposition testimony

15   of Cornforth and Beehler). While the state CDCR and Feds pay generally a fixed

16

17   reimbursement for claims from SJCH, there was and is a competition to increase the

18   quantity of the patient census directed to the facilities. Here, quantity means many

19   millions of dollars added to the coffers of the hospitals. An increase of even a small

20

21   percentage of inmate patient flow translates to millions of dollars. As disclosed

22   previously, SJCH and PPA resorted to kickbacks to establish and increase a

23   competitive edge over Mercy.

24

25   106. The sheer volume of inmate patient feeding from ten

26   prisons is enormous. The geographical areas San Joaquin and Mercy Hospitals

27   provide their services is considered one of the most impacted geographical areas in

28

1  healthcare in the United States. There a fewer medical providers and hospital beds

2  per capita than most areas in the U.S. Therefore, if one hospital, such as San Joaquin

3  creates a monopoly or near monopoly on the receiving of inmate patients, there is a

4

5  serious impact in costs to the Feds and California by way of:

6      a) Increased prison correctional officer times transporting and guarding inmates

7          to and at the hospital (because of the longer waits for service at the hospital);

8

9      b) Lesser quality of care at hospital because of the patient census impact;

10      c) Lesser availability of specialist availability through a network such as PPA,

11

12          because most inmates would be funneled through their network as opposed to

13          Mercy Hospital and the physician network which refers to Mercy;

14      d) The possibility of financial collapse of Mercy Hospital, in an area already

15          greatly underserved with hospital services.

16

17         107. By virtue of the acts described above, Defendants resorted

18

19  to illegal tactics to skew the competitive balance to get false and fraudulent claims

20  paid or approved by the government.

21         108. The United States, unaware of Defendants' illegal tactics to skew

22

23  the competitive balance, paid claims that would not have been paid but for

24  Defendants' unlawful conduct.

25  ### Count VII

26

27  ### California Antitrust Law Bus. & Prof. Code §16600, 16720, 17200.

28

-42-

109. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 108 above as though fully set forth herein.

110. The California Antitrust Law consists of the Cartwright Act, the Unfair Practices Act (UPA) and the unfair Competition Act (UCL), as well as various statutory restrictions on covenants not to compete. Bus. & Prof. Code §16720 prohibits sales of leases on the condition the purchaser not deal in the goods of a competitor where the effect is to lessen competition or tend to create a monopoly in any line of commerce. Bus. & Prof. Code §17200 generally prohibits any unlawful, unfair or fraudulent business act or practice.

111. Section 16720 of the Business and Professions Code prohibits trusts, and is the Cartwright Act counterpart to section 1 of the Sherman Act. Trusts are defined in Section 16720 as: "any combination of capital, skill or acts by two or more persons to *inter alia* carry out restrictions in commerce, prevent competition or fix prices. Section 16720 applies to a wide variety of anticompetitive conduct, *but applies only where there is proof of a "combination of resources of two or more independent entities for the purpose of restraining competition and preventing market competition."* (G.H.I.I. v MTS, Inc., 147 Cal. App, 3d, 256, 266 (1983); (Chavez v. Whirlpool Corp 93 Cal. App.4th.363 (2001)).

112. PPA and PMSO/SJCH combined and colluded to operate an illegal enterprise, the foundation of which were kickbacks to initiate, increase and eventually collapse competition in the same geographical area. To further their

-43-

illegal operation, the two persons (entities) engaged a third party – Dr. Paul Griffin –

in a kickback scheme to divert patients from the Hospital's competitor to San

Joaquin and PPA. The "two or more entities" combined their resources in the

manner of PPA being recipient of kickbacks from the Hospital, and PPA paying

Griffin directly. The creation and instituting of the illegal scheme reached the

highest levels of Adventist Health, as AH's CEO – Scott Reiner (who was named in

the federal action U.S. v White Memorial Hospital) was involved in the

communications of the set up.

113. California courts require a "high degree of

particularity" in pleading conspiracy claims under the Cartwright Act. It is not

sufficient for a plaintiff to merely quote a statute but make factual allegations of

specific conduct and overt acts.

In this case, it is factual and specific:

a) The Hospital was engaged in providing kickbacks to PPA;

b) PPA was recipient of kickbacks from the Hospital;

c) The Hospital and PPA were both recipients of considerable sums of money

   from California and Feds regarding inmate patients;

d) PPA utilized some of the state and federal monies to engage (with hospital

   blessing and funds) and to establish a kickback arrangement with Griffin, to

   increase significantly the census of inmate patients to The Hospital and PPA,

   to the detriment of its sole competitor in the same geographical area.

e) The illegal scheme was activated and continued for several years, resulting in millions of dollars to the Hospital and PPA.

114. The implementation of the Affordable Care Act has created a shifting from fee-for-service payment toward performance based reimbursement. This reform focuses on reducing healthcare costs provided to patients. Thus, "Clinically Integrated Networks" (CINs) was coined by the US Department of Justice and the Federal Trade Commission as a way for competing healthcare providers to jointly negotiate fees for services without violating antitrust laws. (Statement 8 and 9 of the Statements of Antitrust Enforcement Policy in Health Care, issued by the US DOJ and FTC in 1996.) The goal of a CIN is to negotiate fees with a payer in exchange to control costs and provide proficient quality care. An example of a CIN is an Independent Practice Association (IPA) – a group of physicians who agree to provide medical services to beneficiaries, sometimes on a per capital rate. PPA held itself to be an IPA. The overarching benefit of CIN's is to allow providers who are otherwise independent and not financially aligned jointly contract with third-party payors. Negotiating together, rather than individuals, often bolsters the provider's clout with payors. The fundamental component of a CIN is the adoption of clinical protocols, which are a common set of standards used to govern treatment and utilization of services. Requiring all the providers to follow the protocol metrics is intended to improve the

-45-

quality of care to patients. Further it provides a way to oversee and monitor a physician's performance against pre-established benchmarks. It is these protocols and metrics that contribute to CIN's joint negotiation of fees.

115. Forming a CIN must be analyzed under a wide array of laws, including state and federal anti-kickback statutes. The DOJ and FTC have acknowledged that sufficient clinical integration of physicians, despite the lack of sharing substantial financial risk could lead to greater efficiencies enough that joint payor negotiation is not per se illegal, but rather subject to a rule of reasoning analysis. A rule of reason analysis takes into account the characteristics of the arrangement and the environment to determine the likely effect on competition. It determines whether the network of providers has a substantial anticompetitive effect and whether the effect is outweighed by any pro-competitive effectiveness. In 2002, the FTC issued an advisory (FTC Advisory Opinion (2/19/02) regarding IPAs, holding that it would not raise antitrust concerns because the network was non-exclusive and provided for efficiencies such as coordination of care, information sharing, clinical protocols and performance monitoring.

There are four indicia of Clinical Integration:

1) Use of common information technology to ensure exchange of all relevant patient data;

2) The development and adoption of clinical records;

3) Review of care based upon implementation of clinical protocols;

4) Mechanisms to ensure adherence to protocols.

In this case:

PPA is NOT and NEVER HAS BEEN a Clinically Integrated network, as it lacks any of the four indicia required to be considered such. PPA did not provide efficiencies, improvement of patient care or had any program to monitor physician performance.

The FTC and DOJ have been clear that providers may be able to justify the joint negotiation of fees for healthcare services if:

a) The providers share financial risk, or

b) The providers are clinically integrated.

U.S. antitrust laws *prohibit independent providers from jointly negotiating fees for healthcare services, i.e. a hospital and IPA cannot "team up" to negotiate payor contracts. The exception is if the providers are part of a Clinically or Financially Integrated network.*

*PPA cannot enjoy any safe harbor in this area. It appears extremely likely PPA violated antitrust statutes as PPA was clearly not an Clinically Integrated or Financially Integrated network.*

## Count VIII

## Civil Monetary Penalties Act 42 U.S.C. 1320a-7a.

116. Relators repeat and reallege each and every allegation contained in paragraphs 1 through 115 above as though fully set forth herein.

117. The Civil Monetary Penalties Act, 42 U.S. Code 1320a-7a, authorizes the imposition of substantial civil money penalties against an entity which engages in activities including, but not limited to:

a) Knowingly presenting or causing to presented a claim for services not provided as claimed or which is otherwise false or fraudulent in any way;

b) Knowingly giving or causing to be given false or misleading information reasonably expected to influence the decision to discharge a patient;

c) Knowingly retaining an overpayment;

d) Offering or giving remuneration to any beneficiary of a federal health care program likely to influence the receipt of reimbursable items or services;

e) Arranging for reimbursable services with an entity which is excluded from participation in a federal health care program;

f) Knowingly or willfully soliciting or receiving remuneration for a referral of a federal health care program beneficiary;

g) Using a payment intended for a federal program beneficiary for another use.

118. PPA and PMSO/SJCH were engaged in a kickback scheme (in addition to the kickback scheme involving Dr. Paul Griffin), from the onset of the relationship involving inmate patients on April 1, 2008. There was no FMV

established prior to the relationship beginning. The Defendants' own communications indicate years after the relationship began, no FMV had been established, discounts were being given to PPA by SJCH, PPA was not even being invoiced by SJCH and there was only a "verbal agreement" in place. Despite these blatant violations of state and federal statutes, PPA and SJCH knowingly submitted claims to the state and federal government which were false claims because of the lack of FMV and kickbacks. The defendants knew their relationship was in non-conformity of federal and state statutes. Consequently, to cover up their illegality, in 2011 Defendants rushed to create a smokescreen contract between PPA and PMSO.

**WHEREFORE**, Relators pray for judgment against Defendants as follows:

1. that Defendants cease and desist from violating 31 U.S.C. §§3729, *et seq.*, and Cal. Gov't Code §§12651, *et seq.*;

2. that this Court enter judgment against Defendants in an amount equal amount to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. §3729; and a civil penalty of not less than $5,000 and not more than $10,000 for each violation of Cal. Gov't Code §12651, *et seq.*;

3. that Relators be awarded the maximum amounts allowed under 31 U.S.C. §3730(d) and Cal. Gov't Code §12651;

4. that the Relators be awarded the maximum amounts allowed under 42 U.S.C. §1320a-7b(b) and Business & Professions Code §650;

5. that the Relators be awarded the maximum amounts allowed under 18 U.S.C. 1341 & 1343;

6. that the Relators be awarded the maximum amounts allowed under the Federal and California Antitrust Laws;

7. that the Relators be awarded the maximum amounts allowed under 42 U.S. Code 1320a-7a;

8. that Relators be awarded all costs of this action, including attorneys' fees and expenses; and;

9. that the United States, the State of California and Relators recover such other relief as the Court deems just and proper.

FIRST AMENDED COMPLAINT FOR DAMAGES

1  **Demand for Jury Trial**

2     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby

3  demand a trial by jury.

4

5

6  Dated: August 22, 2017                Respectfully submitted,

7

8

9                                        Brian E. Claypool (State Bar No. 134674)
                                         CLAYPOOL LAW FIRM
10                                       4 East Holly Street, Suite 201
                                         Pasadena, CA 91103
11                                       Tel: (626) 345-5480
                                         Fax: (626) 787-1042
12

13

14                                       Attorney for *Qui Tam* Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES