**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES and the STATE OF CALIFORNIA, *ex rel.* THOMAS REILLY, GARRETT LEE, KEVIN SCHMIDT, AND TERRY HILLIARD,<br><br>Plaintiffs,<br><br>v.<br><br>ADVENTIST HEALTH, *et al.*,<br><br>Defendants. | **CASE NO. 17-CV-00613-AWI-SKO**<br><br>**ORDER GRANTING DEFENDANTS ADVENTIST HEALTH, SAN JOAQUIN COMMUNITY HOSPITAL, ROBERT BEEHLER, KURT HOEKENDORF, SCOTT REINER AND WILLIAM BRENT SOPER'S MOTION TO DISMISS RELATORS' FIRST AMENDED COMPLAINT**<br><br>(Doc. No. 35) |

## I.   INTRODUCTION

On May 1, 2017, Plaintiff Relators Thomas Reilly, Garrett Lee, Kevin Schmidt and Terry Hilliard (collectively, "Relators"), acting on behalf of the United States of America and the State of California, filed under seal a *qui tam* action against Adventist Health, San Joaquin Community Hospital ("SJCH") and various individuals for alleged violations of the federal False Claims Act, the California False Claims Act and other state and federal law. Doc. No. 1. The First Amended Complaint ("1AC") was filed on August 23, 2017. Doc. No. 8. Following the filing of the 1AC, both the United States and the State of California elected not to intervene. Doc. Nos. 10 and 17. The case was stayed briefly and remained under seal until July 3, 2019. Doc. No. 24.

Adventist Health, SJCH and some of the individual defendants brought the instant motion to dismiss under 12(b)(6) of the Federal Rules of Civil Procedure. Doc. No. 35. For the reasons set forth below, the Court will grant the motion in its entirety, with leave to amend two of the eight counts set forth in the 1AC.

## II. SUMMARY OF RELEVANT ALLEGATIONS

As set forth in the First Amended Complaint ("1AC"), the allegations in this action primarily involve five entities and seven individuals. The five entities in question are Adventist Health, SJCH, Premier Physician Alliance, Inc. ("PPA") and Premier Management Services Organization ("PMSO"). The seven individuals are Raymond Zurcher, Donald Cornforth, Kurt Hoekendorf, William Brent Soper, Scott Reiner, Robert Beehler and Paul Griffin. Relators[1] allege that these entities and individuals were involved in various sorts of wrongdoing involving kickbacks and the diversion of funds in violation of state and federal law.

### A. Allegations Regarding Entities

According to the 1AC, Defendant SJCH is a hospital based in Bakersfield, California and serving California's Central Valley. Doc. No. 8 ¶ 14.

Defendant Adventist Health is a nonprofit organization that owns and operates 20 hospitals in California and elsewhere, including SJCH. Doc. No. 8 ¶¶ 13, 14.

Relators allege that SJCH "created and formed" PMSO—which is not named as a defendant in this action—on December 21, 2006 as a vehicle for Adventist Health to market and provide management services to SJCH and other hospitals under the Adventist Health umbrella. Doc. No. 8 ¶ 40. The 1AC further states that SJCH was the owner and "sole member" of PMSO. See id. ¶¶ 33, 40.

Defendant PPA is a physician provider network that was created by SJCH on July 25, 2006 to provide care to SJCH's prison inmate patients. Doc. No. 8 ¶¶ 15, 38. According to the 1AC, SJCH began receiving federal inmates in 2007, and PPA contracted with the California

---

[1] All four of the Relators have a professional affiliation of some sort with the Emergency Medical Services Group ("EMSG"). Doc. No. 8 ¶¶ 9-12. EMSG was an enterprise—apparently along the lines of a physician provider network—that had "a contract [] to provide emergency medical services" for SJCH and to "direct and manage [SJCH's] emergency room." Id. ¶¶ 9, 12, 36.

2

Department of Corrections and Rehabilitation ("CDCR") to begin receiving California inmates on behalf of SJCH in April 2008. Id. ¶¶ 38-39. Relators allege that PPA "refer[ed] tens of thousands of inmate patients over at least an eight[-]year period from its contract with the [CDCR] to [] SJCH." Id. ¶ 33.

The 1AC also states that "[a]ll physicians/groups, including EMSG, servicing inmates at SJCH were required to be members of PPA" and "PPA was needed in order for SJCH to maintain its contract to service inmates." Doc. No. 8 ¶ 38. PPA was also responsible for billing CDCR and the federal government for services rendered by EMSG and other physicians at SJCH for inmate patients. Id. ¶¶ 15, 39.

### B. Allegations Regarding Individuals

The 1AC states that Zurcher was the medical director for SJCH's emergency room, the president of PPA and a founding member of PMSO. Doc. No. 8 ¶ 35. Further, Relators allege that Zurcher approved and signed the "backdated sham agreement" between PMSO and PPA, id. ¶ 41, and that Zurcher received a memorandum dated June 21, 2011 "indicating PPA did not have a formal program for Quality Assurance/Utilization Management." Id. ¶ 104.

Cornforth was chief of staff at SJCH, as well as vice president and CEO of PPA. Doc. No. 8 ¶ 35. Cornforth's duties as vice president and CEO of PPA included "dealing with" PMSO. Id. ¶ 40.

Hoekendorf was regional vice president of Adventist Health, a vice president at SJCH, a consultant to PPA and a PMSO board member. Doc. No. 8 ¶ 35. Further, Hoekendorf owned a medical consulting company that provided services to PPA, id. ¶ 43, and was aware, at least as of June 21, 2011, that "PPA did not have a formal program for Quality Assurance/Utilization Management." Id. ¶ 104.

Soper was CFO for both SJCH and PMSO. Doc. No. 8 ¶ 35. He allegedly testified in another case that he "did not pay attention the operations of PMSO" and that there was rarely a meeting of PMSO's board. Id. ¶ 45. He further testified that he did not recall "any funds ever being deposited into PMSO." Id.

Reiner was the CEO of Adventist Health and a PMSO board member. Doc. No. 8 ¶ 35.

3

Beehler was the CEO of both SJCH and PMSO. Doc. No. 8 ¶ 35. According to the 1AC, Beehler appointed himself PMSO's CEO, and "[i]t was Beehler's idea that PPA contract with PMSO …." Id. ¶ 40. Beehler testified in another case that he "did not pay attention the operations of PMSO" and that there was rarely a meeting of PMSO's board. Id. ¶ 45.

Finally, the 1AC states that Griffin "was the directing physician for several California prisons" and "a contract California state employee who oversaw, on behalf of California, the transfer of inmates from prisons to hospitals" in California's Central Valley. Doc. No. 8 ¶¶ 83-85.

### C. Allegations Regarding the PMSO Diversions and Kickback Scheme

Relators allege that instead of sending payment from CDCR and the federal government to "treating physicians like members of EMSG," PPA improperly "diverted" such payments to SJCH and that "[t]his diversion of money was [] accomplished by the creation of PMSO." Doc. No. 8 ¶ 39. Further, they allege that "Defendants developed and implemented a scheme" for SJCH to provide kickbacks to PPA through PMSO "to induce referrals of federal and state inmate business to SJCH" and that "[t]hese kickbacks can be shown to exist through PPA paying less than fair market value to PMSO/SJCH for services rendered …." Id. ¶¶ 39, 64, 67.

As evidence of this scheme, Relators allege that PPA entered into a "feigned operating agreement" with PMSO in 2011 that was "backdated to 2008 in order to coincide with PPA's contract with CDCR." Doc. No. 8 ¶ 41. Further, Relators allege that "there was no written contract in place at all [between PPA and PMSO] for the first three years that PPA began working with prisoner patients" and that "[p]rior to the executed agreement in 2011 there was no management fee agreed to by the entities." Id. ¶¶ 42, 66. Thus, Plaintiffs allege "there was never a fair market value established for PMSO's management services …" Doc. No. 8 ¶ 42.

As to PMSO and PPA, the 1AC further alleges:

- "PMSO was not independent of … Adventist Health, SJCH, or PPA" and "[a]ll Defendants controlled PMSO through overlapping members …," Doc. No. 8 ¶ 44;
- PMSO "never had its own employees," id. ¶ 41;
- PMSO's income and assets declined in the period from 2012 to 2015, id.;
- PMSO had "no bank account, no funds, no revenue flowing in, conducted no invoicing,

4

        no client contracts and never held a board meeting," id.;

- "PMSO did not produce any financials," id. ¶ 45;
- "PMSO's members realized it would have a hard time providing its services for less than 5% and yet eventually agreed to a 5% fee with PPA," id.;
- "PMSO [] never submitted a statement to PPA for the services rendered," id.; and
- "PPA never issued a check or payment to PMSO." Id.

Further, the 1AC states, on the one hand that, "PMSO was the management company for PPA," Doc. No. 8 ¶ 44, and, on the other, that: (i) "PMSO was merely a sham company created to be a conduit for funds to be diverted from PPA to SJCH," id. (ii) "PMSO never operated as a bona fide entity," id.; and (iii) "retroactively dated agreements" between PMSO and PPA "included services that were never actually provided." Id. ¶ 74.

**D. Allegations Regarding the Griffin Kickback Scheme**

The 1AC alleges a kickback scheme involving Griffin in addition to the kickback scheme involving PMSO. As to the Griffin kickback scheme, which Relators characterize as an "illegal patient referral system between SJCH, PPA and [] Griffin," the 1AC states that Hoekendorf sent an email to Griffin on January 9, 2009: (i) noting that Griffin "had the ability and over-site [sic] responsibility related to inmate patient transfer" from Central Valley hospitals unable to provide required care; (ii) offering to compensate Griffin for assistance in developing a "physician panel" for the Central Valley; and (iii) stating that SJCH "look[ed] forward to working with [Griffin] on both the physician panel creation for the Central Valley and for receiving inmate patient admissions transfers from Central Valley Facilities." Doc. No. 8 ¶¶ 84-87. Further, the 1AC alleges that "PPA's ledgers evidence that PPA paid Griffin between $2500.00 to $3000.00 monthly" for some unspecified period of time. Id. ¶ 87. According to Relators, these payments were "made under the guise of [] Griffin being a consultant and hospitalist retained by PPA" but Griffin's "primary role was to triage prisoner patients to SJCH." Id. ¶¶ 84, 87.

Based on the foregoing allegations, Relators brought claims on behalf of the government against Adventist Health, SJCH, PPA, Zurcher, Cornforth, Hoekendorf, Griffin, Soper, Reiner and Beehler under the federal False Claims Act, the California False Claims Act, the federal Anti-

1  Kickback Statute and the California Anti-Kickback Statute, as well as claims for mail/wire fraud,
2  violations of state and federal anti-trust law, and civil monetary penalties under federal law.
3  Griffin answered the 1AC on September 19, 2019. Doc. No. 34. Adventist Health, SJCH, Beehler,
4  Hoekendorf, Reiner and Soper brought the instant motion to dismiss.[2]  Doc. No. 35.

**III.    LEGAL STANDARD**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim may be dismissed because of the plaintiff's "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. See Mollett v. Netflix, Inc., 795 F.3d 1062, 1065 (9th Cir. 2015). In reviewing a complaint under Rule 12(b)(6), all well-pleaded allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. Kwan v. SanMedica, Int'l, 854 F.3d 1088, 1096 (9th Cir. 2017). However, complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Johnson v. Federal Home Loan Mortg. Corp., 793 F.3d 1005, 1008 (9th Cir. 2015). The Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013). To avoid a Rule 12(b)(6) dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678; Mollett, 795 F.3d at 1065.

If a motion to dismiss is granted, the courts should generally grant leave to amend, even if no request to amend the pleading was made. Ebner v. Fresh, Inc., 838 F.3d 958, 962 (9th Cir. 2016). Courts may decline to grant leave to amend, however, where amendment would be futile and where "there is strong evidence of 'undue delay, bad faith or dilatory motive on the part of the

---

[2] Beehler, Hoekendorf, Reiner and Soper are referred to herein as the "Individual Defendants." Adventist Health, SJCH and the Individual Defendants are referred to collectively as "Defendants."

6

movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment, etc.' " Sonoma County Ass'n of Retired Employees v. Sonoma County, 708 F.3d 1109, 1117 (9th Cir. 2013) (brackets in original) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962).

**IV.    ANALYSIS**

Defendants contend that Relators' claims under the federal False Claims Act (Count I) and the California False Claims Act (Count II) should be dismissed because they are not pled with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and because Relators fail (under Rule 8(a)) to plausibly allege a fraudulent course of conduct resulting in the payment of government claims. Doc. No. 35-1 at 7:8-16. Defendants contend that Relators' claims under the federal Anti-Kickback Statute (Count III) and the California Anti-Kickback Statue (Count IV) should be dismissed for pleading deficiencies and because neither statute provides a private right of action. Id. at 7:17-22. And Defendants contend that Counts V through VIII (claims involving mail fraud, wire fraud, anti-trust violations and civil monetary penalties under federal law) should be dismissed for various reasons ranging from pleading defects and lack of standing to the fact that Relators abandoned such claims by failing defend them in their opposition to the Defendants' motion to dismiss. Doc. No. 35, Part IV.C.-F.; Doc. No. 39, Part III.F. The Court will address these arguments in turn.

**A. Claims Under the Federal False Claims Act and the California False Claims Act**

**1. Applicable Law**

The federal False Claims Act imposes liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Id. § 3729(a)(1)(B). The parallel provisions of the California False Claims Act are "substantially identical" and are analyzed in the same manner. See United States v. Safran Grp., 2017 WL 235197, at *4 (N.D. Cal. Jan. 19, 2017); Cal. Gov. Code § 12651, subd. (a)(1) (creating liability where a person "[k]nowingly presents or causes to be presented a false or fraudulent claim for payment or approval"); id. § 12651(a)(2) (creating

liability where a person "[k]nowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim").

Where, as here, a complaint alleges "false certification" as opposed to a "literally false" claim for payment,³ the essential elements of a claim under the False Claims Act are "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." United States ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1174 (9th Cir. 2006). The False Claims Act attaches liability "not to the underlying fraudulent activity" but to the "claim for payment." United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011).

Moreover, because the False Claims Act is an anti-fraud statute, claims brought under the False Claims Act must satisfy Rule 9(b)'s heightened pleading standard. Bly-Magee v. California, 236 F.3d 1014, 1018 (9th Cir. 2001).⁴ Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud," including "the who, what, when, where, and how of the misconduct charged."⁵ Ebeid ex rel. United States v. Lungwitz, 616 F.3d 993, 998 (9th Cir. 2010) (citation and internal quotation marks omitted); United States ex rel. Swoben v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016) ("[b]road allegations that include no particularized supporting detail do not suffice" to allege fraud). This particularity requirement "serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also 'to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." Bly-Magee, 236 F.3d at 1018 (quoting In re Stac Elec. Sec. Litig., 89 F.3d 1399, 1405 (9th Cir.1996) (brackets original).

---

³ Relators allege that "the claims for payment" at issue in this case "were in and of themselves legitimate in the sense that PPA was billing for services that were actually provided to inmates," but were nonetheless "fraudulent and false statements" because they were part of schemes involving kickbacks and the diversion of funds. Doc. No. 8 ¶ 94.

⁴ The heightened Rule 9(b) pleading standard also applies to claims brought in federal court under the California False Claims Act. United States v. Todd Spencer M.D. Med. Grp., 2016 WL 7229135, at *4 (E.D. Cal. Dec. 14, 2016) (citing Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1103 (9th Cir. 2003)).

⁵ Claims subject to Rule 9(b)—including claims of fraud—are also subject to Rule 8(a), which "requires the pleading of a plausible claim." Cafasso, 637 F.3d at 1055.

8

### 2. Analysis

Relators allege two fraudulent courses of conduct under the False Claims Act and the California False Claims Act (together, the "FCA Claims"). First, they allege that SJCH used PMSO to divert payments for inmate medical care to SJCH at the expense of physicians and groups such as EMSG. Doc. No. 8 ¶ 39; Doc. No. 36 at 1:14-16. Second, they allege that SJCH provided remuneration to PPA through PMSO "in the form of discounted (and possibly free) [management] services" in exchange for referrals of "lucrative" inmate patients in violation of state and federal anti-kickback statutes. Id. ¶ 82. As set forth below, neither of these theories is pled adequately.

#### a. Diversion of Funds

Defendants argue that Relators' FCA Claims should be dismissed to the extent they are predicated on diversion of funds because Relators abandoned the diversion theory by failing to address it in the opposition and because the alleged diversion of funds after government claims were paid could not have " 'caused' the submission of a false claim" or "caused a record to be made in support of a false claim." Id., Part IV.A.2.

Defendants are correct that Relators make no argument in the opposition in support of the diversion theory and the Court cannot find fault (at least on the facts alleged in the 1AC) with Defendants' unrebutted contention that the diversion of funds after "legitimate" government claims have been paid, see Doc. No. 8 ¶ 94, could not cause either the submission of a false claim or the making of a record in support of a false claim. See United States ex rel. Brown v. Celegne Corp., 2014 WL 3605896, at *8 (C.D. Cal. July 10, 2014) (observing that the causation element of the False Claims Act is satisfied when defendants' "conduct was a substantial factor in bringing about the false claims and such claims were a foreseeable and natural consequence of its conduct") (citation omitted). Dismissal of the FCA Claims is therefore warranted—to the extent such claims are predicated on the diversion theory—on the grounds that Relators have failed to set forth allegations showing that alleged diversions caused "the government to pay out money or forfeit moneys due," see Hendow, 461 F.3d at 1174, and for the independently sufficient reason that Relators implicitly abandoned—and thus waived—the diversion theory in briefing this motion.

See Heraldez v. Bayview Loan Serv., LLC, 2016 WL 10834101, at *2 (C.D. Cal. Dec. 15, 2016) ("Failure to oppose constitutes a waiver or abandonment of the issue."); Conservation Force v. Salazar, 677 F. Supp. 2d 1203, 1211 (N.D. Cal. 2009) ("Where plaintiffs fail to provide a defense for a claim in opposition, the claim is deemed waived." (citing Locricchio v. Office of U.S. Trustee, 313 Fed. Appx. 51, 52 (9th Cir. 2009)).

### b. PMSO Kickback Scheme

The federal Anti-Kickback Statute prohibits soliciting or receiving any "remuneration" in return for referring an individual to a person for the furnishing of any item or service covered under a federal health care program. 42 U.S.C. § 1320a-7b(b). The California Anti-Kickback Statute, similarly, provides that:

> the offer, delivery, receipt, or acceptance by any [licensed person] of any rebate, refund, commission, preference, patronage dividend, discount, or other consideration, whether in the form of money or otherwise, as compensation or inducement for referring patients, clients, or customers to any person, irrespective of any membership, proprietary interest, or coownership in or with any person to whom these patients, clients, or customers are referred is unlawful.

Cal. Bus. & Prof. § 650, subd. (a).

The Court agrees with Defendants that the 1AC fails to make a plausible showing that PMSO provided anything in the way of "remuneration" to PPA or that PPA referred inmate patients to SJCH as a result. In fact, the allegations in the 1AC itself preclude—or, at least, decisively contradict—such inferences. See Wahl v. JP Morgan Chase Bank, N.A., 2012 WL 13009120, at *3 (C.D. Cal. May 2, 2012) (noting that a conclusory assertion of wrongdoing is not sufficient to state a plausible claim to relief "particularly where it is contradicted by other allegations in the complaint").

*i. Remuneration*

As to "remuneration," the 1AC not only lacks meaningful allegations regarding the types and quantities of services PMSO supposedly provided to PPA, but also alleges that PMSO "was merely a sham company created to be a conduit for funds to be diverted from PPA to SJCH," Doc. No. 8 ¶ 44; "never operated as a bona fide entity," id. ¶ 41; "never had its own employees," id.; "did not produce any financials," id. ¶ 45; and, for that matter, "did not have a formal program for

Quality Assurance/Utilization Management." Id. Notwithstanding Relators' allegation that "PMSO was the management company for PPA," id.¶ 44, it is hard to see, in light of other allegations relating to PMSO in the 1AC, how PMSO could have provided anything of value to PPA in the vein of "management services" or otherwise.[6] See Health Choice Grp., LLC v. Bayer Corp., 2018 WL 3637381, at *34 (E.D. Tex. June 29, 2018) ("To allege the particulars of a scheme to offer kickbacks, relators must sketch how it was that Defendant provided remuneration to its clients, the form of that remuneration … and how Defendant benefitted [sic] from the remuneration." (citation and internal quotation marks omitted; brackets original)).

Moreover, even assuming PMSO managed to deliver "management services" of some sort to PPA (despite its "sham" status and apparent lack of resources), there is no basis in the 1AC to infer PPA paid less than market rate for such services. Relators allege, for example, that "PMSO's members realized it would have a hard time providing its services for less than 5% and yet eventually agreed to a 5% fee with PPA." Id. ¶ 45. While that statement indicates that a fee of "less than 5%" could have been problematic for PMSO in some sense, it says nothing at all about how the higher fee of 5% that PPA allegedly paid compares to market rates. Indeed, the 1AC contains no allegations at all as to market rates for the types of "management services" PPA was supposedly receiving, and regardless, no comparison would be possible because the 1AC just states that PPA's fee was "5%" without saying 5% of what. See United States ex rel. Gough v. Eastwestproto, Inc., 2018 WL 6929332, at *8 (C.D. Cal. Oct. 24, 2018) (finding that relators did not sufficiently demonstrate "remuneration" at the pleading stage where the complaint did not plead the "comparative" market rates of the allegedly discounted services).

The Court similarly sees no merit in Relators' contention that the fact that PMSO lost money in 2013 and 2014 shows that PPA was not "compensating PMSO at fair market value." Doc. No. 36 at 12:15-24. Merely charging fair market value does not guarantee positive income and, in any event, the 1AC alleges the PMSO was created to provide services to multiple entities,

---

[6] The opposition is just as confusing as the 1AC when it comes to explaining PMSO and its role in alleged kickbacks, stating in one breath that "there [were] never any actual services provided by PMSO to PPA," Doc. No. 36 at 1:18, and in the next that "PMSO's sole existence was for the purpose of providing below-market-value services to PPA in exchange for PPA to refer patients from CDCR to SJCH instead of competing hospitals." Id. at 3:8-10.

11

see Doc. No. 8 ¶ 14, any one or combination of which could account for PMSO's losses in 2013 and 2014. Moreover, the Court sees no way of reconciling Relators' contention here that PPA was not paying PMSO enough for its services with Relators' assertions elsewhere in the 1AC and opposition that PMSO was not providing PPA with any services at all.

In short, the 1AC lacks sufficient allegations as to the nature and quantity of services furnished to PPA, the amount PPA paid for such services, and the fair market value of such services to show that PPA was receiving remuneration of some sort in the form of below-market services. This is fatal to the FCA Claims, to the extent they are based on the PMSO kickback scheme, even without applying heightened Rule 9(b) pleading standards.

### ii. Referrals

As to referrals, the 1AC contains a broad allegation that PPA "referred inmate patients" to SJCH, but also alleges: that PPA was formed, owned and controlled by SJCH; that PPA's contract with CDCR provided for the delivery of medical services; that Griffin, as "the directing physician for several California prisons," controlled referrals of inmate patients in the Central Valley; and that SJCH made monthly payments to Griffin as part of a scheme to secure referrals.

The Court finds it implausible that a wholly-owned subsidiary of SJCH somehow had power—through a mere service contract—over inmate placement that SJCH itself lacked and that, according to the 1AC, was vested (as one might expect it to be) in a state employee. See Seven Arts Filmed Entm't, Ltd., 733 F.3d at 1254 (stating that courts are not required to accept as true "unwarranted deductions of fact" or "unreasonable inferences" in deciding Rule 12(b)(6) motions). Moreover, while Relators assert that SJCH received "tens of thousands" of referrals resulting in hundreds of millions of dollars in medical care over the past decade, Doc. No. 8 ¶ 33; Doc. No. 36 at 2:8-11, the 1AC does not provide a single example of a referral that took place at PPA's direction.

The Court therefore finds that the 1AC fails to make a plausible showing that PPA made referrals of inmate patients to SJCH. That defect, too, is fatal to Relators' FCA Claims to the extent they are based on the PMSO kickback scheme. See Guilfoile v. Shields, 913 F.3d 178, 189 (1st Cir. 2019) ("relevant considerations for identifying an unlawful kickback include . . . whether

the person being paid the alleged kickback is in a position to generate [f]ederal health care program business" (internal quotation marks omitted; brackets original)).

### iii. Link Between Remuneration and Referrals

The foregoing findings that Relators have failed to allege remuneration or referrals obviously precludes a finding that the 1AC somehow alleges a link between the two. Also, it is not evident from the 1AC why SJCH would have to provide kickbacks in any form to secure referrals from an entity such as PPA that was completely under its ownership and control.

Inasmuch as Relators have failed to allege remuneration, referrals or any link between the two, the Court finds that Relators have failed to state a plausible claim for relief under either the federal False Claims Act or the California False Claims Act to the extent such claims arise from the PMSO kickback scheme.

### c. Griffin Kickback Scheme

In addition to their allegations regarding the PMSO kickback scheme, Relators appear to take the position that the supposed kickback scheme involving Griffin violated the California Anti-Kickback Statute and, thus, provides a basis for claims under the California False Claims Act.[7]

In the Court's view, however, the allegations involving Griffin fall short of stating a fraud claim. The January 9, 2009 email references Griffin's authority with respect to the placement of inmate patients, as well as SJCH's desire for inmate patient referrals, but also indicates that Griffin would be providing services to SJCH in a consulting capacity. The fact that "PPA's ledger evidences that PPA paid Griffin between $2500.00 and $3000.00 monthly" is not compelling because the time frame in which such payments supposedly occurred is not specified—making it impossible to determine how long such payments continued or to calculate the total amount Griffin supposedly received in exchange for the patient referral "goldmine"—and the payments in question do not appear to be inconsistent with consulting services of the sort contemplated in the

---

[7] The allegations regarding the Griffin scheme appear only in Count III of the 1AC for violation of the California Anti-Kickback Statute, but the opposition suggests that they apply to Relators' claim under the California False Claims Act as well. The Court therefore evaluates them here.

January 9, 2009 email. Further, as with the PMSO scheme, there are no allegations in the 1AC specific to any referral made by Griffin during the many years that this scheme was supposedly in effect.

The Court cannot find that these allegations—which are perfectly consistent with conduct that is not wrongful— satisfy the particularized pleading requirements under Rule 9(b), or even the more forgiving pleading requirements under Rule 8(a). See Iqbal, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)) (internal quotation marks omitted)). Relators therefore fail to state a claim under the California False Claims Act—and, for that matter, under the federal False Claims Act—based on the Griffin kickback scheme.

### d. Liability of Individual Defendants

As set forth above, allegations regarding individuals pertain primarily to each individual's position with the various entities implicated in this action. The 1AC alleges, for example, that Zurcher was the medical director for SJCH's emergency room, the president of PPA and a founding member of PMSO; that Cornforth was chief of staff at SJCH, as well as vice president and CEO of PPA; and that Hoekendorf was regional vice president of Adventist Health, a vice president at SJCH, a consultant to PPA and PSMO board member.

As to the conduct of individuals, the 1AC states, in essence, that Zurcher signed the backdated agreement between PMSO and PPA and received a memorandum indicating PPA did not have a formal program for Quality Assurance/Utilization Management; that Cornforth's duties as vice president and CEO of PPA included "dealing with" PMSO; that Hoekendorf owned a medical consulting company that provided services to PPA and was aware that PPA did not have a formal program for Quality Assurance/Utilization Management; that Soper, in his role as CFO for both SJCH and PMSO, did not pay attention the operations of PMSO and did not recall any funds ever being deposited into PMSO; that Beehler, as CEO of both SJCH and PMSO, acknowledged that treating inmate patients was profitable for SJCH and had the idea for PPA to contract with PMSO; and that Reiner, as CEO of Adventist Health and a PMSO board member, was on an email

14

referencing the triage of inmate patients to SJCH.

To the extent these allegations have any significance, they seem to show merely that SJCH, PMSO and PPA were essentially under the same management, that PPA entered into a service agreement with PMSO, and that PMSO was a "sham entity." While such allegations could arguably be read to support Relators' (abandoned and deficient) claim that SJCH was using PMSO to divert funds, they squarely contradict the inference that PPA was receiving discounted management services from PMSO as kickbacks for inmate patient referrals, inasmuch as they show that PMSO was incapable of delivering services of any value and raise the question of why SJCH would provide kickbacks to induce referrals from an entity that was at all relevant times under its direct control. Moreover, even if the sparse allegations as to the individuals in this case could be read in conjunction with other allegations in the 1AC to allege a fraudulent scheme of some sort, they simply do not provide the ""what, when, where, and how" of any individual's participation in such a scheme. See Ebeid, 616 F.3d at 998.

The Court will therefore dismiss Relators' claims against the Individual Defendants under the federal False Claims Act and California Federal Claims for the additional reason that Relators have failed to set forth the particularized allegations of wrongdoing required under Rule 9(b) as to any of the Individual Defendants. See United States v. Corinthian Colleges, 655 F.3d 984, 998 (9th Cir. 2011) (affirming dismissal of an FCA complaint where it provided "no additional detail" as to the nature of the individual defendants' involvement in the alleged fraudulent acts, but instead relied on the attribution of a general fraud to those defendants).

### 3. Conclusion Regarding False Claims Act

For the foregoing reasons, the Court finds that Relators have failed, under both Rule 8(a) and Rule 9(b) to state a claim under the federal False Claims Act or the California False Claims Act as to any of the Defendants and will grant Defendants' motion to dismiss as to all such claims.

### B. Claims Under Anti-Kickback Statutes

To the extent Relators intend to bring standalone claims under the federal Anti-Kickback Statute (Count III) and/or the California Anti-Kickback Statute (Count IV), the Court finds that such claims fail for the same reasons that Relators fail to state a claim under the federal False

15

Claims Act or the California False Claims Act. Moreover, the Court agrees with Defendants' contention—which Relators make no attempt to address in the opposition—that Relators have not shown that either the federal Anti-Kickback Statute or the California Anti-Kickback Statute provides a private right of action. See United States ex rel. Barrett v. Columbia/HCA Healthcare Corp., 251 F. Supp. 2d 28, 37 (D.D.C. 2003); cf., Vikco Ins. Servs., Inc. v. Ohio Indem. Co., 82 Cal. Rptr. 2d 442, 447 (Ct. App. 1999).

### C. Relators' Remaining Claims

Relators make no mention of their claims for mail fraud, wire fraud, anti-trust violations or civil monetary penalties in the opposition, even though such claims comprise a sizeable portion of the 1AC and Defendants address them cogently—and at some length—in their opening brief. Defendants argue, for example, that there is no private right of action under the federal statutes Relators sue on for mail fraud, wire fraud and civil monetary penalties, and that Relators fail to allege cognizable injury under state or federal anti-trust law. See Doc. No. 35-1, Parts IV.D.-F. The Court can only conclude from Relators' silence and inaction that they have abandoned these claims, either because they found Defendants' arguments against them to be persuasive or because Defendants are unwilling to expend resources attempting to justify them to the Court. The Court will therefore dismiss Counts V, VI, VII and VIII on the grounds that they have been waived. Conservation Force v. Salazar, 677 F. Supp. 2d 1203, 1211 (N.D. Cal. 2009) ("Where plaintiffs fail to provide a defense for a claim in opposition, the claim is deemed waived.").

### D. Leave to Amend

"[T]he 'Supreme Court has instructed the lower federal courts to heed carefully the command of Rule 15(a), F[ed]. R. Civ. P., by freely granting leave to amend when justice so requires.'" Gabrielson v. Montgomery Ward & Co., 785 F.2d 762, 765 (9th Cir. 1986) (quoting Howey v. United States, 481 F.2d 1187, 1190 (9th Cir. 1973) (brackets original)). As noted above, however, Courts may properly decline to grant leave to amend where amendment would be futile and where "there is strong evidence of 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment[.]' "

16

Sonoma County Ass'n of Retired Employees, 708 F.3d at 1117 (quoting Foman v. Davis, 371 U.S. 178, 182 (1962) (brackets original).

Accordingly, the Court grants leave to amend Count I and Count II consistent with the findings set forth in this Order, except that leave to amend is not granted to the extent either Count I or Count II is based on the diversion theory that Relators failed to defend in the opposition. Leave to amend is denied as to Count III and Count IV on the grounds that neither the federal Anti-Kickback Statute nor the California Anti-Kickback Statute provide a private right of action and amendment would therefore be futile. Further, leave to amend is denied as to Count V, Count VI, Count VII and Count VIII because the Court is not willing to expend additional resources—or require Defendants to expend additional resources—on claims that Relators have not shown to have validity and that Relators apparently have no genuine interest in pursuing. See Hild v. Bank of Am., N.A., 2018 WL 6314183, at *8 (C.D. Cal. Aug. 10, 2018) (interpreting plaintiffs' failure to respond to defendants' argument for dismissal of a claim as abandonment of that claim and dismissing without leave to amend); Nuezca v. Capital One Fin. Corp., 2014 WL 573882, at *5 (N.D. Cal. Feb. 12, 2014) (construing plaintiffs' failure to respond to defendants' motion to dismiss a cause of action as abandonment of that cause of action and dismissing with prejudice).

## V.  GRIFFIN'S JOINDER IN MOTION TO DISMISS

Griffin filed a notice of joinder in the instant motion to dismiss on November 15, 2019. Doc. No. 41. As noted above, Griffin filed an Answer in this action on September 19, 2019, Doc. No. 34, and the notice of joinder provides no argument as to why Griffin's joinder should be given effect. Relators, for their part, filed an objection asking the Court to strike the joinder on the grounds that it was filed after Griffin filed his Answer and is therefore untimely. Doc. No. 42.

The Court agrees with Relators that Griffin's joinder is untimely. See Elvig v. Calvin Presbyterian Church, 375 F.3d 951, 954 (9th Cir. 2004) ("A Rule 12(b)(6) motion must be made before the responsive pleading."). Relators' objection is therefore sustained and the Court will strike Griffin's joinder. See State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc., 2014 WL 5427170, at *12 (E.D. Mich. Oct. 24, 2014).

//

## VI. **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss, Doc. No. 35, is GRANTED in its entirety. Count I and Count II of the 1AC will be DISMISSED with LEAVE TO AMEND subject to the limitation set forth above. All other counts in the 1AC will be DISMISSED WITH PREJUDICE. Relators are granted 21 days from the date of electronic service of this Order to file a Second Amended Complaint ("SAC"), consistent with the terms and findings of this Order. If Relators fail to file a SAC within 21 days from the date of electronic service of this Order, leave to amend will be withdrawn and Adventist Health, San Joaquin Community Hospital, Robert Beehler, Kurt Hoekendorf, Scott Reiner and William Brent Soper will be terminated as defendants in this action without prior notice to the parties.

Finally, Relators' objection to Griffin's joinder is SUSTAINED and the joinder is STRICKEN.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion to dismiss (Doc. No. 35) is GRANTED in its entirety;
2. Count I and Count II of the First Amended Complaint are DISMISSED WITH LEAVE TO AMEND (Doc. No. 8);
3. All other counts in the First Amended Complaint (Doc. No. 8) are DISMISSED WITH PREJUDICE;
4. Relators' objection to Paul Griffin's joinder in the instant motion to dismiss (Doc. No. 42) is SUSTAINED and Griffin's joinder (Doc. No. 41) is hereby STRICKEN;
5. Relators are granted 21 days from the date of electronic service of this Order to file a Second Amended Complaint, consistent with the terms and findings of this Order;
6. Defendants shall file their response to any Second Amended Complaint within 21 days of its electronic filing and electronic service;
7. If Relators fail to file a Second Amended Complaint within 21 days from the date of electronic service of this Order, leave to amend will be withdrawn and Adventist

Health, San Joaquin Community Hospital, Robert Beehler, Kurt Hoekendorf, Scott Reiner and William Brent Soper will be terminated as defendants in this action without prior notice to the parties.

IT IS SO ORDERED.

Dated: May 15, 2020

SENIOR DISTRICT JUDGE